## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Bruce Entzi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:04-cv-43 |
| | ) | |
| Don Redmann, Ken Sorenson, | ) | |
| Kevin Arthaud, Leann Bertsch, | ) | |
| Brian Dreher, Brenda Ross, | ) | |
| Melanie Flynn, Stewart Baumgartner,) | | |
| Clyde St. Claire, Jason Komrosky, | ) | |
| Gerald Maragos, Patrick Altringer, | ) | **ORDER GRANTING MOTIONS** |
| Virginia Kleven, Elaine Little, | ) | **FOR SUMMARY JUDGMENT** |
| Tim Schuetzle, Dean McIlroy, | ) | |
| Jeff Wegner, Tammy Hannesson, | ) | |
| Renell Henke, Denise Senger, | ) | |
| Cathy Jensen, Rick Barman, and | ) | |
| Patrick Bohn, | ) | |
| | ) | |
| Defendants. | ) | |

Before the Court are two motions for summary judgment. The first is filed by defendant Dean McIlroy. The second is filed by the remaining defendants who will be referred to as the state defendants. The plaintiff resists the motions.

## I.    BACKGROUND

The plaintiff, Bruce Entzi, is a former inmate of the North Dakota State Penitentiary (NDSP) and the James River Correctional Center (JRCC). He claims that during his imprisonment he was deprived of certain rights, privileges and immunities secured by the constitution and laws of the United States in violation of 42 U.S.C. § 1983. Entzi is acting pro se. All of the remaining named defendants in this case, except for Dean McIlroy, are or were

1

state employees in various capacities during the relevant time period.  Dean McIlroy was an employee of Evercom Systems Inc. during the period of the plaintiff's incarceration.  Evercom Systems Inc. administered the telephone systems at the NDSP and JRCC.

The original criminal complaint was filed on June 8, 1998.  An information was filed on October 19, 1998, charging Entzi with two counts of gross sexual imposition for having sexual contact with two of his daughters who were less than fifteen years of age.  The sexual contact was alleged to have occurred between July 4, 1987, and January 1, 1995.

Trial began on August 11, 1999, and concluded the next day with the jury returning guilty verdicts on both counts.  During the trial, Entzi and his trial counsel, Arnold Fleck, stipulated that on February 26, 1998, he had a telephone conversation with his wife during which he admitted he had inappropriate sexual contact with two of his daughters.  The stipulation was read to the jury by the prosecutor but not admitted into evidence.  This was done in lieu of having the entire conversation played for the jury.

A sentencing hearing was held October 19, 1999.  Entzi was sentenced to ten years imprisonment, with five years suspended, and a term of supervised probation.  The North Dakota Supreme Court affirmed the convictions on July 24, 2000. State v. Entzi, 615 N.W.2d 145 (N.D. 2000).  Entzi was represented by attorney Monte Rogneby on his appeal.

Entzi was incarcerated at the North Dakota State Penitentiary from October 19, 1999, to November 22, 1999, and the James River Correctional Center from November 22, 1999, to January 22, 2004.  The phone system at JRCC experienced some technical difficulties during April 2002.  Entzi has produced a list of telephone calls which shows that some telephone calls he attempted to make between April 9, 2002, and April 25, 2002, were blocked.

On January 12, 2004, prison officials petitioned to revoke the Entzi's probation.  The grounds for the petition were that Entzi had not completed sex offender treatment while incarcerated and had not provided a DNA sample as required.  Entzi appeared at an order to show cause hearing before the district court on January 20, 2004.  He posted a cash bond the same day and a probation revocation hearing was held on March 22, 2004.  The petition was ultimately dismissed by the district court September 3, 2004.  Entzi failed to complete sex offender treatment because he maintained his innocence and in order to complete the treatment he would have been required to admit his conduct and take responsibility for it.  In dismissing the revocation petition the state court concluded that Entzi should not have his probation revoked for simply maintaining his innocence.

On March 24, 2004, Entzi filed a petition for post-conviction relief in state court.  Entzi was appointed counsel by the state.  Most of Entzi's claims were dismissed on April 19, 2004.  The balance of the petition was later voluntarily withdrawn.

On April 29, 2004, Entzi filed a petition for habeas corpus relief in federal court.  The petition was dismissed as untimely on May 5, 2004, the time for filing a habeas corpus petition having run on or about October 23, 2001. See Entzi v. North Dakota, No. A1-04-51, 2004 WL 1047880 (D.N.D. May 5, 2004).

This lawsuit was commenced April 21, 2004, with the filing of the complaint.  Entzi was twice allowed to amend the complaint.  Shortly after the suit was commenced Entzi voluntarily dismissed forty-three of the named defendants.  Twenty-three defendants remain.  On September 27, 2005, the Court granted a motion for partial judgment on the pleadings and dismissed seven of the Entzi's claims.

On October 13, 2005, Magistrate Judge Charles S. Miller Jr. issued an Order, after conducting a status conference, identifying all remaining issues in this case. Claims not identified in that Order were deemed waived when no objections to the order were filed. Fourteen issues remain as to the state defendants and one issue remains as to defendant McIlroy.

One of the more developed allegations is that the state defendants conspired, along with McIlroy, to monitor Entzi's telephone calls to his attorney while he was imprisoned so that information gleaned from this monitoring could be passed along to the North Dakota Supreme Court and used to deny his appeal. It is also alleged that this monitoring lead to the confiscation of jury affidavits[1] which the Entzi claims he mailed to his attorney but never arrived.

Another claim alleges the violation of his right to practice his religious beliefs when he was on one occasion prohibited from attending a religious retreat and on another occasion his Bible was confiscated for two days. Other claims allege a lack of library access, a lack of dental care, being required to strip naked prior to producing a urine sample, not being allowed to sign legal documents his attorney brought to the prison, having his probation revoked, being placed in segregation in retaliation for filing grievances, and attempts to coerce incriminating statements from him.

All remaining issues are addressed in the summary judgment motions and in this Order.

---

[1]Entzi refers to "jury affidavits" in his pleadings and deposition. The "jury affidavits" are in fact questionnaires that prospective jurors completed prior to the plaintiff's trial. For the sake of simplicity the defendants have adopted this terminology and the Court will do the same.

## II.     STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Clark v. Kellogg Co., 205 F.3d 1079, 1082 (8th Cir. 2000).  A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996).  The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact.  If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings.  Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e); Krein v. DBA Corp., 327 F.3d 723, 726 (8th Cir. 2003).  A mere trace of evidence supporting the non-movant's position is insufficient.  A non-movant must present more than a scintilla of evidence and must present specific facts to create a genuine issue of material fact for trial.  F.D.I.C. v. Bell, 106 F.3d 258, 263 (8th Cir.1997).  The facts must generate evidence from which a jury could reasonably find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

III.     ANALYSIS

### A.  Official Capacity Claims

In paragraph six of the amended complaint the Entzi states he is suing all the state defendants in their "individual and or personal official capacity."  The court assumes from this rather inarticulate statement the plaintiff is attempting to sue the state defendants in their individual and official capacities.  All the defendants remaining in this case, except defendant McIlroy, are state officials in one capacity or another.

A suit against a state official in his or her official capacity is really a suit against the official's office. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  Such a suit is really a suit against the state. Id.  States and state subdivisions are not persons under § 1983. Id.  Officials in their individual capacity are considered persons under § 1983. Hafer v. Melo, 502 U.S. 21, 26 (1991).  Thus, a suit pursuant § 1983 against a state official in his or her individual capacity is cognizable while a suit against a state official in his or her official capacity is not. Id.

Insofar as the Entzi sought to sue any of the state defendants in their official capacity those claims are dismissed as they are barred as a matter of law.

### B.  Right of Access to the Courts

Entzi alleges in paragraphs ff, N, k, and i of the amended complaint that prison officials interfered with his ability to file an accurate appeal to the North Dakota Supreme Court and a timely habeas corpus petition by tampering with his mail, monitoring and blocking attorney telephone calls, and  by failing to provide adequate law library facilities.

Prison inmates have a constitutional right to meaningful access to the courts. Bounds v. Smith, 430 U.S. 817, 823 (1977).  In order for an access to the courts claim to be successful, the

plaintiff must allege and be able to demonstrate prejudice resulting from application of the suspect policy. Berdella v. Delo, 972 F.3d 204, 210 (8th Cir. 1992). This requirement of prejudice or actual injury derives from the principle of standing. Lewis v. Casey, 518 U.S. 343, 349 (U.S. 1996). It is not the role of the courts to manage prisons and for this reason no cause of action exists absent actual injury. Id. at 349-50. In order to meet the actual injury requirement inmates must be able to demonstrate they were actually hindered in pursuing a legal claim. Id. at 351.

The injuries Entzi allegedly suffered are difficult to grasp as the he did appeal his conviction to the North Dakota Supreme Court. State v. Entzi, 615 N.W.2d 145 (N.D. 2000). Furthermore, the habeas corpus petition he filed was approximately two and one-half years late. See Entzi v. North Dakota, No. A1-04-51, 2004 WL 1047880 (D.N.D. May 5, 2004). Entzi has not explained how some missing documents could result in a two and one-half year delay. And his state petition for post-conviction relief was voluntarily withdrawn. Nevertheless, the Court will give additional consideration to his access to the courts claims.

### 1. Mail

It is well-established that inmates have a right to receive mail. Thornburgh v. Abbott, 490 U.S. 401 (1989). However, that right may be limited by prison regulations that are reasonably related to legitimate penological interests. Weiler v. Purkett, 137 F.3d 1047 (8th Cir. 1998). The United States Supreme Court has held that an inmate's privileged mail may not be opened for inspections for contraband outside the presence of the inmate and has defined privileged mail as "mail to or from an inmate's attorney and identified as such." Wolff v. McDonnell, 418 U.S. 539, 574, 576-77 (1974); see Cody v. Weber, 256 F.3d 764, 768 (8th Cir.

2002).  The question of whether a particular piece of correspondence is "legal mail" is a question of law.  See Sallier v. Brooks, 343 F.3d 868, 873 (6th Cir. 2003) (holding that the "determination of whether particular kinds of correspondence qualify for the constitutional protection accorded a prisoner's 'legal mail' is a question of law properly decided by the court, not one of fact that can be submitted to a jury").

The plaintiff alleges prison officials tampered with his incoming and outgoing legal mail.  This is a very serious allegation on the surface.  Inmates do retain the First Amendment right to send and receive mail. Thongvanh v. Thalcker, 17 F.3d 256, 258 (8th Cir. 1994).  A prison policy which obstructs an inmates ability to send and receive legal mail can violate that inmate's right to access to the courts. Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998).  The prison policy in question prohibits the opening of legal mail.  There is an exception for instances where contraband is suspected and in these cases the legal mail is only to be opened in the presence of the inmate for visual inspection.  The legal mail will not be read during this visual inspection.  This policy is in compliance with the law in this area which does not allow prison officials to read incoming or outgoing legal mail. Id. at 258-59; Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997)(finding prison policy of only opening legal mail and inspecting it for contraband in the presence of the inmate while not reading the mail was constitutionally sufficient).

Entzi's arguments regarding the mail tampering are, at best, confused.  He alleges outgoing  mail was "held up" for up to seven days in order to improperly charge additional postage and in an attempt to force him to use the prison telephone system to contact his attorneys.  Entzi claims these telephone calls were monitored by prison officials.  No injury from the alleged delay has been put forward.  Failure to demonstrate actual injury is fatal to such a

claim. Cody v. Weber, 256 F.2d 764, 768 (8th Cir. 2002).  The evidence submitted by the state defendants shows oversized and overweight mail was routed through the property office so the proper postage could be metered and deducted from the inmate's account.  A short delay is to be expected from such a procedure and does not constitute a constitutional violation.  Entzi has provided no evidence to support his claim of lengthy delays or non-delivery.

The state defendants do admit to several isolated incidents over a four year period where Entzi's incoming legal mail was inadvertently opened by mail clerks.  Entzi filed grievances regarding several of these incidents.  The response to the grievance admitted to "unfortunate incidents" which occurred when a new mail clerk inadvertently opened several pieces of Entzi's mail.  The affidavit of Don Redmann who was Director and Warden of JRCC during Entzi's incarceration addresses the mail issue.  He points out that the opening of the legal mail was inadvertent and that the mail was not read.  Entzi was advised by staff when such an error occurred.  None of the mail clerks who worked at JRCC during Entzi's incarceration are defendants in this action.  Those clerks were advised of their errors and reminded of their responsibilities.

The inadvertent opening of legal mail, standing alone, is not actionable under section 1983. Gardner, 109 F.3d at 431.  In order to maintain a successful claim for denial of meaningful access to the court based upon the opening of legal mail a plaintiff must show he suffered prejudice. Id.  Entzi has provided no evidence of improper motive or credible evidence of prejudice.  He has asserted his counsel put erroneous information in his appellate brief but fails to specify what that erroneous information was or how it harmed him.

Much discussion is devoted to the alleged seizure of the jury affidavits.  Entzi asserts the

juror affidavits were seized from the mail on two occasions.  The first time when his appellate counsel, Monte Rogneby, mailed him a copy of the appellate brief which contained, or Entzi asserts should have contained, the juror affidavits in the appendix and a second time when he sent a number of documents, including the juror affidavits, to another attorney, Ray German, who was also assisting him.  Mr. German states he did not receive the juror affidavits.

The flaws in Entzi's theory are numerous.  We have no idea if the first mailing from attorney Rogneby actually contained the juror affidavits.  Mr. Rogneby was never deposed and Entzi has not obtained an affidavit from him.  As for the second mailing Entzi admits in his brief that he never opened the second mailing from Mr. Rogneby but he forwarded it to Mr. German. This means we do not know if the juror affidavits were contained in the second mailing either. This entire scenario is simply implausible when one considers that attorney German could have simply requested the juror affidavits from attorney Rogneby or Entzi could have simply instructed Mr. Rogneby to provide copies to Mr. German.  When factual context renders a claim implausible a plaintiff must come forward with more persuasive evidence than otherwise might be necessary to survive summary judgment. <u>Fender v. Bull</u>, No. 04-3898, 2006WL305518 at *4 (8th Cir. Feb. 10, 2006).  Entzi has not done this.

Some mention is made in Entzi's brief about not being able to request a rehearing on his direct appeal so he might further address the issue of biased jurors.  This could have been easily accomplished through his appellate counsel.  Despite his assertions of monitored telephone calls and tampered mail the record is clear that he was in regular contact with counsel and could have requested a rehearing through counsel or directly.  The juror affidavits were contained in the files of Mr. Rogneby and the North Dakota Supreme Court so that would have been no obstacle to

moving for rehearing.

One unanswered question is <u>why</u> prison officials would selectively target the juror affidavits in Entzi's legal mail. Entzi suggest that prison officials were funneling information from his mail and telephone calls with his attorneys to the justices of the North Dakota Supreme Court, an allegation so preposterous it refutes itself. Nor is explanation provided as to how the alleged seizure of the juror affidavits in March 2000 caused him to be unable to file motion for habeas corpus relief until April 2004.

What is clear to the Court from the voluminous filings is that the juror affidavits were in the possession of Entzi's appellate counsel, Mr. Rogneby, the Clerk of Court for McIntosh County where the trial was held, and the Clerk of the North Dakota Supreme Court. Entzi obtained additional copies of the juror affidavits after he was released from prison. Any minimally competent attorney representing Entzi could have easily obtained these records and there is no reason to suspect any attorney who advised Entzi was not competent. The issue of biased jurors was fully considered on direct appeal. Entzi has failed to put forth any meaningful proof of his rather outlandish claims or support any notion of injury. Summary judgment is appropriate.

### 2. Telephone Calls

Entzi alleges prison officials and defendant McIlroy illegally monitored and conspired to monitor telephone calls between himself and his attorneys. Entzi alleges this constitutes a violation of the Fourth and Sixth Amendments, 18 U.S.C. § 2515, and 47 U.S.C. § 605. This is the only claim that relates to defendant Mcilroy. During the period of the plaintiff's incarceration McIlroy was an employee of Evercom Systems, Inc., the entity providing telephone

service to inmates at the North Dakota State Penitentiary and James River Correctional Center.

The Inmate Handbook issued by the North Dakota Department of Corrections and Rehabilitation states that telephone calls to attorneys will not be monitored. Telephone calls to non-attorneys are subject to monitoring. A prisoners right of access to the courts does not guarantee any particular means of access. Aswegan v. Henry, 981 F.2d 313, 314 (8th Cir. 1992)(finding unlimited telephone use not guaranteed). All that is required is that access to the courts be meaningful, effective and adequate. Bounds v. Smith, 430 U.S. 817, 822 (1977).

It is not the prison policy which is in question in this case. Rather it is the violation of that policy which is challenged. Entzi argues listening to his telephone calls to his attorney's violated his constitutional rights. The parties have focused their arguments on the actual injury requirement and whether there is any proof that prison officials actually monitored any of Entzi's telephone calls with his attorneys.

If Entzi's arguments regarding his legal mail were difficult to understand then his arguments regarding his telephone calls are doubly so. Numerous citations to exhibits are made in the apparent belief these exhibits prove his case. The Court has resorted to simply reading through all the exhibits in search of some evidence which would support the argument. None could be found. Numerous affidavits have been submitted by the defendants disavowing any monitoring of attorney telephone calls. Entzi submitted affidavits from three attorneys, Chad McCabe, Sid Gross, and Ray German, in support of his claims. However, none of these attorneys stated in their affidavits that they believed their telephone calls with the plaintiff were monitored. Rather, they only reiterated that Entzi believed the calls were monitored. There is nothing in the record to support the claim that McIlroy conspired with any of the state defendants

to monitor Entzi's telephone calls with his attorneys.

One argument seems to be that the telephone calls must have been monitored because the defendants knew when to open his legal mail and steal the jury affidavits. The Court has already rejected the mail argument. There is no evidence, other than Entzi's own unsupported beliefs, that any of the defendants removed anything from Entzi's mail.

Entzi also claims the North Dakota Supreme Court was aware of facts regarding his biased juror argument that he only revealed to his attorney. There is no reasonable basis to conclude the North Dakota Supreme Court learned of his biased juror argument through monitored attorney phone calls. The existence of biased jurors was the principal basis for his appeal and that the justices were aware of his argument shows only that they read the appellate brief filed by Entzi's attorney. This argument is simply absurd.

Another argument surrounds the change in Entzi's good time accrual rate. He claims the only way the defendants could have known he had sexual contact with his daughters after 1991 was if they listened to his telephone calls with attorney Rogneby. Prior to 1991, inmates in North Dakota could earn ten days good time per month. After the law was changed inmates could earn only five days good time per month. N.D.C.C. § 12-54.1-01. Which law applied depended on when the criminal acts were committed. What Entzi fails to understand is that criminal information charged an offense taking place from July 4, 1987 to January 1, 1995. Since the criminal activity he was convicted of took place both before and after 1991 he could only accrue five days good time per month and not ten days as prison staff originally believed. A criminal information is a public document. Entzi admits in his brief that prison officials had in

13

their possession the information[2] and the criminal judgment which reference these dates.  Since the information was public there was no need to monitor Entzi's telephone calls to obtain this information and thus his assertions prove nothing.

Entzi presents no evidence on the technical capabilities of the prison telephone system. McIlroy stated in his response to plaintiff's interrogatories that it was not possible for attorney telephone calls to be monitored.  Warden Redmann stated in his affidavit that the telephone system was maintained in such a manner that inmates used a special code or pin number when placing to calls to attorneys who had been placed on the inmate's attorney list.  The use of the pin number prevented prison officials from monitoring the telephone call.  Entzi has come forth with no expert evidence to refute this.

As for the allegations that telephone calls were blocked, a number of telephone calls to attorneys were apparently blocked between April 9, 2002, and April 25, 2002.  The calls that did not go through were made to non-attorneys and attorneys alike.  The explanation for this, as given by then Director of the North Dakota Department of Corrections and Rehabilitation Elaine Little, is that the entire prison telephone system experiencing technical problems during the month of April 2002.  She states that a number of prisoner phone calls were blocked due to these problems but that the blocking was not intentional.  Entzi was given this same explanation at the time the problems occurred.  Entzi has presented no evidence whatsoever to support his accusation that the blocking was intentional, directed solely at him, or that a conspiracy existed between McIlroy and prison officials to block Entzi's telephone calls to his attorney.  The record reflects that during this same period when the inmate telephone system was experiencing

---

[2]Entzi erroneously refers to the charging document as a complaint.

problems not all the plaintiff's telephone calls to his attorneys were blocked.  Entzi has failed to explain how having a few telephone calls to his attorney blocked injured or prejudiced him in any material fashion.  The problem with the phone system in April 2002 occurred well after Entzi's direct appeal had been rejected, (July 2000), and the time for filing a habeas corpus petition had run, (October 2001).  Most of Entzi's telephone calls did go through and the occasional failure of a policy does not amount to the denial of access to the courts.  Arney v. Simmons, 26 F.Supp.2d 1288, 1296 (D.Kan. 1998).  At best prison officials were negligent but negligent conduct alone will not support a cause of action under section 1983 for deprivation of civil rights.  Daniels v. Williams, 474 U.S. 327, 330 (1986).

As Entzi has put forth no evidence which is even mildly supportive of this claim and has not met the actual injury requirement, summary judgment is appropriate.

### 3.  Library Access

Entzi alleges prison officials violated his constitutional rights by having the prison law library open only fifteen hours a week, not providing trained legal assistance, not providing access to a photocopier, failing to update legal materials in a timely fashion, and not allowing him to order his own law books.  In paragraph ff it is further alleged his appeals were frustrated by giving him insufficient assistance from the law librarian and insufficient access to legal books.  Entzi claims the insufficiencies constitute a due process violation and also a First Amendment violation.

In Lewis v. Casey, 518 U.S. 343 (1996), the Supreme Court explained what constitutes meaningful court access.  Prison law libraries and legal assistance programs are acceptable means of assuring access to the courts but any methodology which confers meaningful access

will suffice. <u>Lewis v. Casey</u>, 518 U.S. 351, 356 (1996).  There is no constitutional right to the permanent provision of counsel. <u>Id.</u> at 354.  Prison law libraries assure inmates the means to attack their convictions or conditions of confinement. <u>Id.</u> at 355.  The right to meaningful court access is not an abstract right but rather requires there have been actual injury.  <u>Id.</u> at 351.  In other words, an inmate alleging the prison law library was subpar must also be able to demonstrate how the allegedly insufficient law library hindered his efforts to pursue a nonfrivolous legal claim. <u>Id.</u> at 351, 353.

Entzi alleges the prison library was deficient in several ways.  The only injury suggested by the Entzi is that the habeas corpus petition he filed in federal court was untimely because the prison law books were out of date and he was unaware of the one year statute of limitations.  Entzi does not address the actual injury requirement in his brief.  No explanation has been given as to how the lack of a photocopier, untrained legal assistance and not being allowed to order law books caused injury.

In response the state defendants submit the affidavit of Virginia Kleven, the corrections program administrator who oversaw the administration of law library at JRCC during the period of the Entzi's incarceration.  She states in her affidavit that the prison library was open approximately eighteen hours per week.  She recalls that Entzi was doing most of his legal research during 2002.  Submitted along with the affidavit is a 2002 inventory of the law library.  Included among the extensive holdings were the Federal Civil Judicial Procedures & Rules for the years 1997, 1998, 1999, 2000, and 2001.  This is the very same handbook used by chambers staff at the United States District Court in Bismarck and presumably at most other federal courts throughout the country.  It contains all the relevant portions of Title 28 pertaining to habeas

corpus petitions under section 2254. There would have been no impediment to Entzi researching the applicable one year statute of limitations given the availability of these books.

In addition, it must be noted that Entzi filed his untimely section 2254 petition on April 29, 2004. The petition was approximately two and one half years late. The North Dakota Supreme Court had rejected his direct appeal on July 24, 2000, and thus the time for filing a habeas corpus petition would have run on or about October 23, 2001. Entzi engaged in extensive correspondence and numerous telephone calls with several different attorneys throughout the course of his incarceration. Thus, Entzi had ample opportunity to enquire as to the applicable statute of limitations on a federal habeas corpus petition.

In Lewis, the district court injunction, which the Supreme Court reversed, called for prisoners to have access to the prison library for ten hours per week. Lewis, 518 U.S. at 347. Three days a week of law library access has also been held to be reasonable. Flittie v. Solem, 827 F.2d 276, 280 (8th Cir. 1987). Entzi fails to explain why fifteen hours a week of law library access was insufficient other than to merely assert that it was not enough.

The Court finds that law library access of 15 hours per week is reasonable. The Court also finds that, based upon the inventory submitted, which Entzi has not contravened, the prison library was adequate to assure meaningful court access. Furthermore, Entzi has shown no injury traceable to a lack of access as the JRCC prison library contained ample resources wherein Entzi could have researched the applicable statute of limitations. Entzi's pro se submissions in the present case demonstrate his ability to conduct basic legal research. As the library has been found sufficient and Entzi has failed to meet the actual injury requirement, this claim fails.

**C. Religious Freedom**

Constitutional claims arising in a prison setting and brought pursuant to section 1983 are scrutinized under a lesser standard than the strict scrutiny analysis that would typically be applied to constitutional claims arising in a non-prison setting.  Murphy v. Mo. Dept. of Corrs, 372 F.3d 979, 982 (8th Cir. 2004).  Prison regulations and rules are valid, even though they restrict constitutional rights, if they are "reasonably related to a legitimate penological interest." Id. citing Turner v. Safley, 482 U.S. 78 (1987).  In making this determination four factors are to be considered.  The first is whether there is a valid rational connection between the prison regulation or action and the government interest justifying it. Id.  Second is whether there are alternative means available to the prisoners to exercise the right. Id.  Third, is whether an accommodation would have an adverse ripple effect on the guards, other prisoners, and prison resources. Id. at 982-983.  Last, the court must consider whether there are any alternatives which fully accommodate the prisoners with little cost to valid penological interests. Id.  In applying these factors the Court must remember that prison officials are to be accorded great deference in the arena of prison security. Id.

**1. Kogudus Retreat**

In paragraph L of the amended complaint the Entzi alleges his First Amendment rights, the Religious Freedom Restoration Act, and 18 U.S.C. § 247 were violated when he was not allowed to attend a special religious retreat that was held at the JRCC and sponsored by the Kogudus Renewal Ministry.  The Kogudus Renewal Ministry is a Christian organization affiliated with the Lutheran Church.  Entzi, who is Lutheran, was not allowed to attend as he had recently broken some prison rules which, as per the Inmate Handbook, subjects the offending

inmate to a loss of open house and special event activities for six months.  It was later determined through a grievance process that the religious retreat did not constitute a special event and Entzi should have been allowed to attend the event.

Entzi stated during his deposition that these Kogudus retreats were held twice a year while he was incarcerated at JRCC.  During his incarceration Entzi missed one of these retreats for unexplained reasons and attended three to five other retreats.  His claim rests on the one retreat prison officials did not allow him to attend.  He did attend Bible classes on a regular basis and there was no interference by prison officials with this activity.

Section 247 of Title 18 makes it a crime for any person to damage or destroy religious real property or obstruct by force persons from exercising their religious beliefs.  Entzi's reliance on this criminal statute is entirely misplaced.

Entzi also claims the state defendants violated his rights under the Religious Freedom Restoration Act of 1993 (RFRA). 42 U.S.C. § 2000bb et seq.  The RFRA was found to be unconstitutional in 1997. City of Boerne v. Flores, 521 U.S. 507, 536 (1997)(holding RFRA unconstitutional as applied to state officials); see also Young v. Crystal Evangelical Free Church, 141 F.3d 854, 858 (8th Cir. 1998).

This leaves Entzi's claim that his First Amendment rights were violated.  Although not specified the Court will treat this as a free exercise claim.  No argument has been made that Entzi's religious beliefs are not sincere.  Such a determination would be a factual in nature and thus not appropriately addressed at the summary judgment stage. Murphy v. Mo. Dept. of Corr., 372 F.3d 979, 983 (8th Cir. 2004).

Applying the first Turner factor to the present case, the Court finds prison officials were

19

attempting to enforce a prison rule that forbid prisoners who had committed a major infraction from attending special events.  Entzi had committed a major infraction sometime prior to the retreat and his special events privileges were revoked for six months.  The acting director of the North Dakota Department of Corrections and Rehabilitation later determined through a grievance process that religious retreats should not be considered special events.  This finding by the acting director does not mean that restricting a prisoners' ability to attend special events when there has been a violation of a prison rule is not rationally connected to maintaining good order within the prison.  Sanctioning rules violations is necessary to maintaining safety and security within a prison.  See Murphy v. Mo. Dept. of Corr., 372 F.3d 979, 983 (8th Cir. 2004).

Applying the second Turner factor, it appears the plaintiff had other means of practicing his faith, even while he was on restriction.  For instance he could read his own Bible and attend regular Bible study classes which were not considered special events.  The incident was isolated and presented no serious obstacle to the practice of the Entzi's faith.  There is no evidence the prison officials applied the rules in anything but a good faith manner in this case.  Even if special events did include religious activities, the rule would likely not violate a prisoners free exercise rights under the circumstances given that other avenues of religious observation were available. The existence of alternative means for a prisoner to practice his faith weighs against any finding that free exercise rights were violated. Id.

The accommodation factors would weigh in favor of Entzi as it appears the policy was later clarified so that it did not apply to religious events.  This was accomplished through the prison grievance procedures.

The burden placed on the Entzi's religious liberties was insubstantial.  The policy,

although later determined to have been applied incorrectly, was still rationally related to maintaining security.  Other avenues of worship were still available to the Entzi.  The Court concludes that a one time good faith denial of attendance at a religious retreat does not constitute a violation of the Entzi's free exercise rights.

### 2.  Bible Confiscation

In paragraph Z of the amended complaint the Entzi alleges his first amendment rights were violated when prison officials confiscated his Bible.  Entzi had taped some legal papers into the Bible.  Prison officials considered this concealment an alteration which is a violation of prison rules which prohibit the alteration of any item or article.  The confiscation took place two days before Entzi was released from prison.  The Bible was returned upon his release.

The Bible was confiscated because it was altered in violation of prison rules which prohibit the alteration of any item possessed by an inmate.  This rule is necessary to maintain security within the prison.  Altered books can be used to hide weapons, drugs, escape plans, etc. Entzi has provided no valid reason why he needed to tape materials in his Bible.  Allowing some alterations while prohibiting others would not be practicable in terms of the resources necessary to decide what is and is not allowed.  The rule applies to all prisoners and all alterations.  Entzi was without his Bible for a mere two days.  The Court finds the rule prohibiting the possession of any altered item was reasonably related to legitimate security interests. See Murphy, 372 F.3d at 983.

As discussed in the previous section Entzi had other means of practicing his faith.  He could have obtained an unaltered Bible.  Allowing an exception to the altered property rule for Bibles would clearly create security problems for prison officials and have a ripple effect as to

what other religious articles could be altered.

Even were the rule regarding altered items unreasonable, the Court is of the opinion that the confiscation of Entzi's Bible and the denial of access to the Bible for a mere two days cannot possibly rise to the level of a constitutional violation as the seizure did not place anything more than an inconsequential burden on the Entzi's ability to exercise his faith and constitutes nothing more than a minor inconvenience.

### D.  Signing Legal Documents

In paragraph cc of the amended complaint, the Entzi alleges he was not allowed to sign some legal documents relating to the sale of the plaintiff's farm which his attorney brought to the prison after regular business hours.  The Inmate Handbook states that attorney visits are limited to regular business hours which are defined as 8:00 a.m. to 4:30 p.m. Monday through Friday.  The Entzi claims this is a violation of prison rules, some unspecified federal law, and section 12-44.1-14 of the North Dakota Century Code.  Entzi was able to sign the documents at a later time and in a timely fashion.

In his responsive brief Entzi concedes this claims should be dismissed and the Court will so order.

### E.  Dental Visits

In paragraph y of the amended complaint, Entzi alleges he experienced a six month delay in getting his teeth cleaned by the prison dentist while he was incarcerated.  He claims this constitutes an Eighth Amendment violation.

The Eighth Amendment requires prison officials to provide inmates with medical care. Estelle v. Gamble, 429 U.S. 97, 103 (1976).  This right encompasses dental care as well. Fields

v. Gander, 734 F.2d 1313, 1314 (8th Cir. 1984).  In order to prevail on a claim that lack of medical care constituted cruel and unusual punishment in violation of the Eighth Amendment an inmate must show that: (a) the lack of medical care alleged was objectively serious; and (b) prison officials were deliberately indifferent to the inmate's health or safety.  Laughlin v. Schirro, 430 F.3d 927 (8th Cir. 2005).  The seriousness of the deprivation should also be measured by examining the effect of the delayed treatment.  Id.  This effect must be demonstrated by verified medical evidence which establishes the degree of harm.  Id.

Entzi claims in his brief that his gums were bleeding when he requested the teeth cleaning but he concedes he did not bring this to the attention of prison officials.  Entzi has not alleged or suggested any serious harm came to him from the delay in getting his teeth cleaned. Entzi has submitted no documentary medical evidence in support of his claim.  Given the complete lack of evidence establishing any detrimental effect, the Court concludes Entzi has failed to a establish an essential element of his claim and thus summary judgment will be granted.

**F.  Grievance Procedures**

In paragraph j of the amended complaint Entzi alleges prison officials failed to adequately respond to the grievances he filed concerning the monitoring of telephone calls with his attorney.  No legal basis for this claim has been stated.

The Court finds this claim particularly difficult to understand.  From Entzi's brief the Court gathers only that some prison official told him to quit filing frivolous grievances.  It was and is apparently the position of Entzi that he has the constitutional right to file grievances.  The state defendants suggest Entzi is simply unhappy with the responses he got to some of the

numerous grievances he filed while incarcerated.  There is no suggestion that he was not allowed to file grievances or that his grievances were not considered.

In any case, there is no constitutional right to a grievance procedure.  See Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993)(finding no constitutional right violated by state prison officials who failed to process all of an inmate's grievances); see also Flick v. Alba, 932 F.2d 728 (8th Cir. 1991)(holding federal grievance procedures do not create a constitutionally protected liberty interest).

As such, summary judgment on this claim is appropriate.

**G.  Strip Search**

In paragraph S of the amended complaint Entzi alleges the prison policy which required him to be stripped searched and remain naked while producing a urine sample violates Eighth Amendment ban on cruel and unusual punishment.  Entzi complains that he was, on one occasion, subjected to a strip search prior to producing a urine sample and that he was forced to stand naked for 15-30 minutes during the process.  Prison Director Tim Schuetzle explained at his deposition that the policy is necessary to assure that the urine sample is unadulterated.

The Eighth Amendment protects prison inmates from cruel and unusual punishment. Parkus v. Delo, 135 F.3d 1232, 1234 (8th Cir. 1998).  This right is violated when prison inmates are subjected to the unnecessary and wanton infliction of pain at the hands of prison officials. Id.

Serious wanton deprivation of the "minimal civilized measure of life's necessities" and deliberate indifference to a prisoner's health or safety may also constitute cruel and unusual punishment. Key v. McKinney, 176 F.3d 1083, 1086 (8th Cir. 1999).

Prison administrators are entitled to wide discretion on matters of prison security and conditions of confinement. <u>Franklin v. Lockhardt</u>, 883 F.2d 654, 657 (8th Cir. 1989). That a prison inmates may be subjected to a strip search and urinalysis has long been recognized. <u>Bell v. Wolfish</u>, 441 U.S. 520, 558 (1979)(strip search); <u>Spencer v. Farrier</u>, 807 F.2d 753 (8th Cir. 1986)(urinalysis). Visual body cavity searches have been held not to violate the ban on cruel and unusual punishment where security concerns necessitated the searches. <u>Franklin</u>, 883 F.2d at 657. Being placed in handcuffs and shackles for twenty-four hours has been held not to violate the Eighth Amendment. <u>Key</u>, 176 F.3d at1086. Placing a prisoner in a concrete cell while naked for two days without bedding or running water has also been upheld. <u>Seltzer-Bey v. Delo</u>, 66 F.3d 961, 963 (8th Cir. 1995). Observation during the production of a urine sample by a prisoner or probationer is nothing out of the ordinary. <u>See</u> <u>Tyler v. Barton</u>, 901 F.2d 689, 691 (8th Cir. 1990)(rejecting parolee's objection to visual monitoring of urine collection and noting such procedures ensures valid samples); <u>United States v. Burton</u>, 866 f.2d 1057, 1059-60 (8th Cir. 1989)(detailing urine collection procedures which include visual monitoring).

In the present case Entzi was deprived of his clothes for no more than thirty minutes. The procedure was necessary to assure the urine sample obtained from Entzi was his alone and unadulterated. Similar procedures have been approved of previously by the Eighth Circuit. While the procedure in question may have been somewhat embarrassing it hardly shows a serious deprivation of "the minimal civilized measure of life's necessities." Nor has there been any showing the policy affected Entzi's health or safety or was applied in a wanton fashion. Prison life is not without its indignities. Indignities alone do not constitute cruel and unusual punishment. This claim fails.

### H.  Attempt to Coerce a Statement

In paragraph ee and R of the amended complaint Entzi alleges prison officials attempted to coerce a statement from him.  Entzi states the attempts to gain a confession from him were fruitless.  He alleges the attempts themselves violated his Fifth Amendment rights.  He also states no <u>Miranda</u> warnings were given him.

In his brief in response to the state defendant's summary judgment motion Entzi concedes this claim should be dismissed.  The Court will dismiss the claim.

### I.  Retaliation for Filing Grievances

In paragraph dd of the amended complaint Entzi alleges his placement in disciplinary detention for thirteen days was in retaliation for filing grievances.

Retaliation for the exercise of a constitutionally protected right is actionable under Section 1983.  <u>Madewell v. Roberts</u>, 909 F.2d 1203, 1206 (8th Cir. 1990).  Despite there being no constitutional right to a grievance procedure, prison officials may not retaliate against a prisoner for filing frivolous grievances.  <u>Sprouse v. Babcock</u>, 870 F.2d 450, 452 (8th Cir. 1989).  If the discipline is imposed for an actual violation of prison rules then the prisoner's retaliation claim must fail.  <u>Goff v. Burton</u>, 7 F.3d 734, 738 (8th Cir. 1993).  The burden of proof in such a case is upon the prisoner to show that but for the unconstitutional retaliatory motive the discipline would not have occurred.  <u>Id.</u>  This is a decidedly heavy burden.  <u>Id.</u>

The state defendants respond with affidavits and exhibits showing the thirteen days of disciplinary detention were imposed in response to three separate instances of misbehavior by Entzi.  The first instance involved disorderly and threatening behavior directed toward a female case manager.  The case manager perceived the Entzi's actions in bolting up, stepping toward

her, leaning into her personal space, and bracing his hands on the counter while telling her he was through with her as threatening.  A corrections officer witnessed the incident.  The second incident occurred when it was discovered that paper had been inserted in the lock on Entzi's locker, thus denying prison officials a means of opening and searching the locker.  The third incident occurred when Entzi told a guard, among other things, "you can take those handcuffs and shove them up your ass."  These actions are clear violation of prison rules.  No claim for retaliation can be stated where the discipline arose from acts the prisoner was not permitted to perform.  Goff, 7 F.3d at 738.

Entzi's argument is extremely difficult if not impossible to follow.  His logic seems to be that because he was never placed in disciplinary detention before he started writing grievances that must mean the he was being retaliated against.  He does not dispute the lock incident but merely states that "if your officers would have let me put my property away, there would not have been an incident."  The disorderly conduct incident is not discussed.  The incident with the handcuffs is rebutted with the bald assertion that the guards lied.  The exhibits Entzi references do not support his assertions.

With nothing before it other than unsupported conclusory allegations, the Court concludes summary judgment is appropriate.

**J.  Probation Revocation**

In paragraphs aa and bb of the amended complaint the Entzi alleges that prison officials conspired to detain him upon his release from prison through the use of a falsified arrest warrant and wrongfully sought to have his probation revoked.

On January 12, 2004, a petition was prepared seeking revocation of Entzi's probation.  It

was alleged that Entzi had violated the terms and conditions of his probation by refusing to participate in and complete a sex offender treatment program prior to release and for refusing to submit a DNA sample. Both of these requirement were included in the criminal judgment as conditions of probation. The probation officer who signed the petition applied to state district court for an order to show cause hearing and an arrest warrant. On January 13, 2004, a state district judge ordered Entzi to appear and show cause why his probation should not be revoked. An arrest warrant was issued as well. A bail hearing was held on January 20, 2004, and Entzi was "released" on bail. At this hearing Entzi was asked if he would like court appointed counsel. He advised the Court that he would retain his own counsel. A revocation hearing was scheduled for March 22, 2004. All of this occurred while Entzi was still incarcerated at the JRCC. He was released as scheduled from JRCC on January 22, 2004. The revocation petition was dismissed by the state court on September 3, 2004.

Entzi was released as scheduled on January 22, 2004. The arrest warrant was served and bail granted while Entzi was still incarcerated. He suffered no additional detention because of the revocation proceedings. The Court is at a loss to understand how any of this was improper or prejudiced or injured Entzi in any way. All the proceedings took place before a state district judge. The actions of the probation officer were certainly proactive in that Entzi had not yet been released from prison when the petition was signed and filed but that does not mean those actions were improper. Even if Entzi had been wrongfully detained because of the probation revocation petition the probation officer who brought the petition would be entitled to absolute immunity because the bringing such a petition is in the nature of a prosecutorial function. See Figg v. Russell, 433 F.3d 593, 599 (8th Cir. 2006)(finding parole board, prison warden and

correctional officers, and parole agent were entitled to absolute immunity in prisoner's section 1983 action challenging her incarceration as illegal after her parole was revoked).  This claim is completely frivolous and as Entzi has not shown any injury, summary judgment is appropriate.

  **K.**  **Qualified Immunity**

  The state defendants have raised the issue of qualified immunity in their motion for summary judgment.  However, the argument is not fully developed and does not address each claim individually.  The likely reason for this is twofold: the first being a strong belief the case can be resolved favorably on other summary judgment grounds; and secondly, a recognition that qualified immunity arguments are best made at the early stages of the case coupled with the frustration of not having been able to do so due to the confusing nature of Entzi's claims and various submissions.

  Defendant McIlroy also raises the issue of qualified immunity.  His arguments are fully developed but rely on a novel extension of qualified immunity to a defendant who everyone agrees is not a state actor.  The argument is interesting but the Court need not address the issue to resolve the motion.

  As the state defendant's argument are not fully developed and discussion is not necessary to the resolution of the motions, the Court has chose n not to address the issue of qualified immunity.

**IV.**  **CONCLUSION**

  Many of Entzi's theories border on the paranoid.  The arguments contain leaps of logic which land them in the realm of conspiracy theory.  The Court has patiently sifted through the voluminous filings in an attempt to understand Entzi's claims and arguments only to be left with

the feeling of having endured a rather lengthy and fanciful dime novel.  The federal courts are no place for frivolity or hobby litigants.  It is time for Entzi to put down his pen and get on with his life.

Accordingly and for the reasons explained above, the state defendants' motion for summary judgment (Docket No. 138) and Dean McIlroy's motion for summary judgment (Docket No. 147) are **GRANTED** as to all claims.  Let Judgment be entered accordingly.

**IT IS SO ORDERED.**

Dated this 20th day of March, 2006.

/s/ *Patrick A. Conmy*
Patrick A. Conmy, Senior District Judge
United States District Court
